UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| LARRY S. ALESTOCK ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 5:14-cv-00043 |
| v. ) | |
| ) | MEMORANDUM OPINION |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner, ) | By: Joel C. Hoppe |
| Social Security Administration, ) | United States Magistrate Judge |
| Defendant. ) | |

Plaintiff Larry S. Alestock asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his applications for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). ECF No. 7. Having considered the administrative record, the parties' briefs and oral argument, and the applicable law, I affirm the Commissioner's final decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id*., but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof at steps one through

four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Alestock first filed for SSI[1] on February 4, 2010, R. 11, and was denied at the administrative level, R. 1–3. Alestock appealed to the district court, and the Commissioner filed a consent motion to remand, which the court granted. R. 900, 906–07. On May 2, 2012, while his appeal was pending, Alestock filed a new application for SSI. *See* R. 889, 904. The Appeals Council ordered the ALJ to consolidate Alestock's remanded case with his new application and address both in one decision. R. 903–04.

At the time of his first application, Alestock was 59 years old, R. 200, and had worked most recently as a dishwasher and construction flagger. R. 35–36, 230. Alestock alleged disability beginning June 30, 1998, because of tuberculosis, liver problems, gout, and hepatitis C. R. 87. Alestock appeared with counsel for his consolidated hearing on November 20, 2013. R. 817. He testified about his past work, his medical conditions, and the limitations his conditions have on his daily activities. R. 824–48. A vocational expert ("VE") testified about the nature of Alestock's past work and his ability to perform other jobs in the national and local economy. R. 850–57.

The ALJ denied Alestock's application in a written decision dated February 12, 2014. R. 798–814. He found that Alestock had severe impairments of hepatitis C and left hip osteoarthritis and bursitis, but determined that these impairments, alone and in combination, did not meet or equal a listing. R. 801–02. The ALJ determined that Alestock had the residual functional

---

[1] Alestock also filed for disability insurance benefits, but withdrew that claim at his first administrative hearing on May 17, 2011. *See* R. 30, 33–34.

capacity ("RFC")[2] to perform medium work[3] with some climbing and postural limitations. R. 802–12. Relying on the VE's testimony, the ALJ concluded at step four that Alestock can return to his past relevant work as a lawn mower or landscape worker, construction flagger, or dishwasher. R. 812–13. As an alternative finding, the ALJ determined that Alestock can perform other jobs that exist in significant numbers in the economy, such as packer, cleaner, and warehouse worker. R. 813–14. He therefore determined that Alestock was not disabled under the Act. R. 814. The Appeals Council declined to review that decision, R. 758–60, and this appeal followed.

### III. Relevant Medical Evidence

*A.  Treatment Records*

Alestock's medical record begins on May 4, 2008,[4] when he visited the emergency department with reports of chest pain, shortness of breath, nausea, abdominal discomfort, and difficulty urinating. R. 351–52. An X-ray of his chest revealed an abnormality indicative of pneumonia or tuberculosis. R. 337. A follow-up X-ray showed mass-like lesions in his right and left lower lobes and right upper lobe. R. 361. According to the radiologist, these lesions could indicate infectious diseases. *Id.* He recommended a bronchoscopy followed by a biopsy. *Id.* In a treadmill stress test, Alestock achieved 88% of the predicted heart rate for someone his age. R. 487.

---

[2] A claimant's RFC is the most he can do on a regular and continuing basis despite his impairments. 20 C.F.R. § 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, typically he or she also can do light and sedentary work. *See* 20 C.F.R. § 416.967(c).

[4] Treatment notes report that Alestock had "never seen a doctor before in his life." R. 351.

4

On June 13, 2008, Alestock began care with Kimberly Cheek, M.D., at Augusta Medical Center. R. 378. He reported continuing chest pains, but no respiratory problems or shortness of breath. *Id.* Alestock underwent a biopsy. R. 336, 344. He was soon thereafter diagnosed with tuberculosis, R. 367, 373, 433, and went through associated treatment from June 27, 2008, to July 1, 2009, R. 446. Alestock tolerated the treatment well, R. 367, 446, and consistently reported no shortness of breath, R. 367, 370, 447. X-rays of his lungs taken in December 2008 and May 2009 showed a mild degree of plural thickening and minimal scarring in the right lobe, but no active cardiopulmonary disease. R. 348–49. During his treatment, testing showed an elevated liver function that led to a diagnosis of hepatitis C.[5]

Alestock filed his first application for SSI on February 4, 2010. R. 11. On March 25, 2010, he visited the emergency department complaining of abdominal and chest pain radiating from the epigastric area with mild shortness of breath and nausea. R. 481–92. A stress test produced exercise induced ischemia in the right coronary artery territory, R. 491, and he was scheduled for an angiography, R. 481. Alestock declined the procedure and left against medical advice. *Id.* The attending physician diagnosed him with gastroesophageal reflex disease at discharge and provided him with corresponding medication. R. 482.

On April 8, 2010, Alestock returned to the emergency department, again complaining of chest pain. R. 451–63. An X-ray, echocardiograph, cardiac catheterization, and other tests were performed and all returned unremarkable findings. R. 452. Alestock "had a fairly uneventful time" and was discharged two days later asymptomatic. *Id.* Doctors concluded that he likely suffered an esophageal spasm. *Id.* They additionally diagnosed him with anemia, likely chronic, and mild hyperglycemia. *Id.*

---

[5] Alestock continually confuses hepatitis C and HIV. *See* R. 38, 53, 455, 641, 893, 1234. He did not test positive for HIV. *See* R. 431.

5

Alestock returned to Dr. Cheek on May 4, 2010. R. 615. He reported significantly reduced chest pain on medication for esophageal spasm, but complained of left hip pain. *Id.* He denied shortness of breath and asked to see a specialist to address his hepatitis C. *Id.* Dr. Cheek diagnosed left hip bursitis and referred him to physical therapy. *Id.* She also diagnosed hyperglycemia and hypertension. *Id.* At a follow-up appointment on June 2, 2010, Alestock reported that he had not attended physical therapy and did not intend to reschedule. R. 688. He described his hip pain as unchanged and denied shortness of breath. R. 688–89. Dr. Cheek diagnosed diabetes and again encouraged physical therapy. *Id.*

On May 20, 2010, Alestock saw Vanessa D. Lee, M.D., on referral for his chest pain and hepatitis C. R. 692–93. He reported weekly episodic chest pain and shortness of breath. *Id.* Dr. Lee adjusted his medications and ordered tests for hepatitis treatment. R. 693. He began hepatitis C treatment in March 2011. R. 751. In June 2011, Alestock reported that he was doing well, and Dr. Cheek recorded that he was stable on his continuing hepatitis C treatment. R. 1163–64. Dr. Cheek also noted that Alestock's blood count was low, and Dr. Lee had reduced his medications. *Id.*

Alestock's anemia continued, and on June 30 and July 7, he received blood transfusions. R. 1043. On July 12, 2011, Alestock told Dr. Lee that he was "feeling very well" since his latest transfusion, although he complained of some diffuse abdominal pain. *Id.* He endorsed minor fatigue, but denied dizziness and did not report shortness of breath. R. 1043–44. Dr. Lee stated that, besides the issues with anemia, his hepatitis C treatment was going well. R. 1044.

In early September 2011, Alestock completed his hepatitis C treatment. R. 1031, 1161. On September 15, 2011, he complained to Dr. Cheek of fatigue, blurred vision, chest pain, shortness of breath, cough, nausea, and dizziness. R. 1161 At a follow-up appointment on

September 29, 2011, he complained of shortness of breath, chest pain, dizziness, and nausea that worsened with exertion. R. 1034–35. He also endorsed chronic joint and back pains. R. 1035. Dr. Cheek expressed concern over his continuing anemia and ordered tests and another blood transfusion. R. 1035. She noted Alestock's history of tuberculosis, but stated that follow-up cultures and X-rays had shown no sign of a recurrence. R. 1036.

Alestock was hospitalized later that day for severe anemia and chest pain. R. 749–54. After a blood transfusion, his condition improved and he did not experience chest pain or shortness of breath. R. 749. The attending physician concluded that an underlying iron deficiency combined with the suppressive effects of the hepatitis C treatment caused the episode, R. 750, and noted that Alestock's diabetes was under control. R. 749. Alestock was discharged in stable condition two days after admittance. *Id*.

On October 27, 2011, Alestock reported "finally starting to feel a little better," though he continued to endorse fatigue, blurred vision, chest pain, shortness of breath, cough, nausea, weakness, and dizziness. R. 1158. On December 15, 2011, Alestock reported doing "very, very well." R. 1031. He had significant improvement in his fatigue and no regular dizziness, shortness of breath, or chest pain, although he did have shortness of breath with exertion and diffuse joint aches. R. 1031–32. Dr. Lee noted a negative December 7, 2011, hepatitis C screen, and she deemed his treatment successful despite complications from anemia. R. 1032. She also reported that his anemia had "improve[ed] quite well." *Id*.

In the midst of Alestock's hepatitis C treatment, Dr. Lee answered questions posed in a letter from Alestock's counsel. R. 743–45. She opined that Alestock could perform work at a light or sedentary exertion level, but he would not be able to maintain expected standards of exertion, persistence, and pace over a 40-hour workweek or 8-hour workday. R. 744–45. She

attributed his limitations to side effects of his hepatitis treatment, not an underlying condition, and she opined that they would abate when his treatment concluded. R. 745.

On March 15, 2012, Alestock saw Todd E. Wolf, M.D. R. 1148. He reported feeling well and denied chest pain or fatigue. *Id.* Recent tests showed that Alestock's anemia was stable. *Id.* On March 15, 2012, Alestock reported to Dr. Wolf that he had fatigue, but no pain or any other symptoms. R. 1146. Dr. Wolf noted that a colonoscopy on February 12 showed diverticular disease and polyps. *Id.*; *see* R. 1168. He repeated that Alestock's anemia appeared stable and ordered a five-year follow-up colonoscopy. *Id.*

On April 26, 2012, Alestock returned to Dr. Cheek for a follow-up appointment and stated he was doing well. R. 1142–45. He presented chest pain, coughing, and dyspnea, but no wheezing or joint pain. R. 1143. Dr. Cheek continued his medications. R. 1144.

Matthew Sleziak, D.O., examined Alestock at the request of the state disability agency on September 29, 2012. R. 1234–40. He found that Alestock walked with a steady, symmetric gait and had decreased strength in bilateral hip flexion, decreased sensation to light touch in his left leg and hand, atrophy in his right palm and positive Tinel's sign in his right wrist, and decreased abduction in his shoulders bilaterally. R. 1238–40. His strength, pulses, reflexes, range of motion, and coordination were otherwise good. *Id.* Dr. Sleziak opined that Alestock could sit, stand, and walk normally in an 8-hour workday; could frequently carry 50–60 pounds and occasionally carry 70 pounds; had no postural limitations; and could only occasionally handle, feel, grasp, or finger with his left hand, but had no other manipulative restrictions. R. 1240.

State agency examiner William Amos, M.D., reviewed Alestock's medical record as of October 11, 2012. R. 894–96. He opined that Alestock could occasionally carry 50 pounds and frequently carry 25 pounds; could stand or walk for 6 hours in an 8-hour workday and sit for 6

8

hours in an 8-hour workday; and had no manipulative, postural, environmental, or push-pull limitations. R. 896. Dr. Amos found that Dr. Sleziak's manipulative limitations were not supported by the rest of the medical evidence. *Id.*

On January 3, 2013, Alestock reported to the Emergency Department with complaints of ongoing fatigue, intermittent atypical chest pain that worsened with exertion, and left testicular pain. R. 1249–56. He experienced shortness of breath and dizziness with some of his chest pains, but did not have any cough, nausea, syncope, or palpitations. R. 1252. He stated that these conditions had intensified after he shoveled snow a week before. *Id.* The attending physician found no evidence of a tuberculosis recurrence or a heart condition, but thought it possible that Alestock suffered from "dyspnea related to [an] underlying chronic obstructive pulmonary disease and perhaps some scarring from his prior TB infection." R. 1254. A radiograph of his chest showed chronic markings in his right upper lobe that appeared unchanged since similar studies in 2008. R. 1260. An echocardiograph and stress test found no abnormalities. R. 1249–50. Alestock's chest pain resolved overnight and he was discharged in stable condition with a referral to an urologist for his testicular pain. *Id.*

## IV. Discussion

On appeal, Alestock argues that the ALJ improperly discounted his statements about the intensity, persistence, and limiting effects of his symptoms, especially his shortness of breath. Pl. Br. 5–8, 9–11, ECF No. 15. He also questions the ALJ's adoption of the VE's classification of Alestock's past relevant work.[6] *Id.* at 8–9.

---

[6] Alestock is additionally concerned with the ALJ's statement that Alestock's lifetime accumulation of twelve years of substantial gainful activity with no reported earnings since 1990 "is not indicative of an individual recently motivated to work." R. 801; Pl. Br. 10–11. Alestock contends that this comment is outside the proper five-step ALJ analysis and indicates bias. Pl. Br. 10.

9

*A.     Alestock's Testimony*

At his first administrative hearing on May 17, 2011, Alestock testified about his past work and physical impairments. He described significant side effects from the hepatitis treatment he was undergoing, including fatigue and nausea. R. 38–41. He had occasional chest pains with accompanying blurred vision and dizziness, worsened by exertion. R. 41–42. He testified that he suffers from shortness of breath that requires him to take breaks while walking or performing activities of daily living. R. 44–45. Though the last jobs he held were as a dishwasher, construction flagger, and construction laborer in 1998, R. 35–37, 60, he has worked odd jobs part time since then for family and friends, R. 46, 58–59, 62. These jobs mostly involved yard work such as mowing, raking, and weed-whacking. *Id.* He also helped maintain the household for family members that he lived with since 1998, first his mother and then his sister. R. 62–64. Alestock implied that friends offered him these jobs out of charity. R. 66.

Alestock provided additional testimony at his second administrative hearing on November 20, 2013. He testified that he had experienced a continual cough for the last six or eight months and was awaiting results of a tuberculosis test. R. 824. He tires and gets winded

---

A reviewing court must start from the presumption that the ALJ was not biased. *See Withrow v. Larkin*, 421 U.S. 35, 47 (1974). The burden to overcome this "presumption of impartiality rests on the party making the assertion [of bias], and the presumption can be overcome only with convincing evidence that a risk of actual bias or prejudgment is present." *Navistar Int'l Transp. Corp. v. EPA*, 941 F. 2d 1339, 1360 (6th Cir. 1991) (citing *Schweiker v. McClure*, 456 U.S. 188, 196 (1982) and *Withrow*, 421 U.S. at 47). The facts of this case do not overcome this presumption. Regardless of his comment, the ALJ engaged in a thorough analysis of Alestock's claim. *See, e.g.*, *infra* parts III.B, III.C. In light of the legally sound and well-supported opinion before the Court, "it was only a healthy measure of skepticism, not bias, which is evident from the ALJ's contested observation." *Craig v. Astrue*, No. 5:09cv28, 2010 WL 1472735, at *5 (W.D. Va. Apr. 12, 2010) *report and recommendation adopted*, No. 5:09cv28, 2010 WL 1727568 (W.D. Va. Apr. 28, 2010) (rejecting argument that an ALJ was biased when he stated that the claimant's minimal earnings record since 1980 "was not indicative of an individual motivated to work").

more easily since his first bout of tuberculosis and has difficulty walking or completing household tasks without taking 15 minute breaks. R. 826–27. He is interrupted by chest or testicular pain multiple times a day. R. 828–29. He has trouble sleeping, is constantly tired, and has difficulty getting up during the day. R. 830–33. When discussing his past odd jobs, Alestock described a specific instance when somebody else had a job weeding and he helped for money. R. 829–30. He did other yard work and cleaning a couple times a week. R. 839–40. He reiterated that friends likely allowed him to do this work out of charity, R. 830, and testified that he had not done an odd job for three or four years, R. 847.

B.  *The ALJ's Credibility Determination*

The ALJ determined that Alestock's impairments could produce the type of symptoms he alleged, but his "contentions concerning the intensity, persistence, and limiting effects of those symptoms are not entirely credible in light of the longitudinal record as a whole." R. 804. After a five-page summary of the medical record, R. 804–09, the ALJ bolstered this statement with specific examples. He noted that Alestock's treatment had been "routine, conservative, and unremarkable—no surgery has been recommended; [he] has not attended physical therapy; and there has been no ongoing treatment by a cardiac, orthopedic, pain management, or mental health specialist." R. 809–10. The ALJ found Alestock's tuberculosis treatment to be an exception to that statement, but noted that it did not span more than a year and all medical evidence in the record states that it was resolved. R. 810. Additionally, physical examinations had not revealed "significantly decreased strength, sensation, or range of motion of any extremity." R. 810. Alestock's March 2010 Function Report listed daily activities that were not as limited as his complaints would suggest. *Id.* The ALJ noted that Alestock did yard work for cash as recently as a week before his May 2011 hearing and he reported shoveling snow the week before his January

11

2013 emergency department visit. *Id.* Finally, the ALJ found that specific inconsistencies within Alestock's testimony concerning his odd jobs and his failure to report his income "raise[] questions about his credibility in general." *Id.*

C.   *Credibility Analysis*

The regulations set out a two-step process for evaluating a claimant's allegation that he is disabled by symptoms from a medically determinable impairment. *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006). The ALJ must first determine whether objective medical evidence[7] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of symptoms alleged. 20 C.F.R. § 416.929(a); *see also Craig*, 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they affect his physical or mental ability to work. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig*, 76 F.3d at 595.

The latter analysis often requires the ALJ to determine "the degree to which the [claimant's] statements can be believed and accepted as true." SSR 96-7p, 1996 WL 374186, at *2, *4. The ALJ cannot reject the claimant's description of his impairment "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 416.929(c)(2); *accord Hines*, 453 F.3d at 565. Rather, he must consider all the relevant evidence in the record, including the claimant's other statements, his treatment history, any medical-source statements, and the objective medical evidence. 20 C.F.R. § 416.929(c).

---

[7] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. § 416.928(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* § 416.928(a).

12

The ALJ must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015); *Eggleston v. Colvin*, No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013) (citing SSR 96-7p, at *4). A reviewing court will defer to the ALJ's credibility finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)); *see also Mascio*, 780 F.3d at 640.

Alestock's case does not present exceptional circumstances. On the contrary, the ALJ's determination that Alestock's statements were not credible reflects an adequate review of the record and analysis. *See* R. 803–10. The ALJ first summarized Alestock's statements describing his fatigue and other symptoms, limited daily activities, and perceived functional limitations. R. 803–04; *see* 20 C.F.R. § 416.929(c)(3). He then reviewed and summarized in detail the medical record. R. 804–09; *see* 20 C.F.R. § 416.929(c)(2). The ALJ considered and weighed the medical opinions from Alestock's treating physicians, the consultative medical examiner, and the state agency physicians. R. 811–12; *see* 20 C.F.R. § 416.929(c)(1). His ensuing credibility analysis included a four paragraph narrative description that spanned more than a page and contained specific references to support in the record. R. 809–10; *see* 20 C.F.R. § 416.929(c)(4); SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

Furthermore, the record supports the ALJ's reasoning. For example, the ALJ found that, aside from the hepatitis C treatment that lasted less than a year, Alestock received "routine, conservative, and unremarkable" treatment for his conditions. Alestock underwent intensive, short-term treatment plans to address his tuberculosis and hepatitis C, and the treatment caused

13

temporary, significant side effects. *See* R. 446, 1161. These treatments were successful, and he has not since suffered from those illnesses. *See* R. 1032, 1036. Doctors addressed his hypertension and diabetes with medication and suggestions of improving diet and exercise. *See* R. 615, 749, 1153, 1163. Likewise, although Alestock's anemia, exacerbated by the hepatitis treatment, R. 750, caused an emergency hospitalization in September 2011, that condition was brought under control through ongoing medication. Alestock has had multiple diagnostic studies performed in response to his chest pain, *see, e.g.*, R. 452, 491, 518, 519, 1043, but physicians have only treated the condition with medication, R. 615, 1159, 1163–64. For Alestock's hip pain, Dr. Cheek repeatedly recommended physical therapy, though he did not attend. R. 615, 688–89.

Alestock notes that the ALJ did not cite the lung X-rays taken in May 2008. Pl. Br. 6–7. This observation is accurate, although the ALJ did discuss chest X-rays taken in 2013. R. 809. The physician who attended to Alestock in 2013 noted that scarring could possibly cause Alestock's shortness of breath. Two radiologists, however, had previously characterized the scarring and thickening in Alestock's lungs as mild and minimal. R. 348–49. Moreover, aside from treating his tuberculosis, Alestock's physicians did not order ongoing medical treatment related to his lung function. While the ALJ's discussion could have been more thorough, I cannot find that this omission meaningfully erodes the reasons for the ALJ's characterization of Alestock's treatment and his ultimate credibility determination.

In his disability filings and hearing testimony, Alestock reported experiencing debilitating pain. R. 828–29, 1017–18. He did not report similar symptoms to his doctors, and, accordingly, they did not prescribe treatment that would reflect such symptoms. The ALJ may consider any medical treatment (or lack thereof) to alleviate symptoms when evaluating the applicant's credibility. 20 C.F.R. § 416.929(c)(3). "While there is 'no bright-line rule [for] what

14

constitutes conservative versus radical treatment,'" the ALJ correctly found that Alestock's only prescribed treatment consisted of taking medications, a course he reasonably deemed to be conservative and inconsistent with complaints of disabling limitations. *Bolden v. Colvin*, No. 4:13cv32, slip op. at 17 (W.D. Va. Jul. 23, 2014) (Hoppe, M.J.) (quoting *Gill v. Astrue*, 3:11cv85, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012)), *adopted by* 2014 WL 4052856 (Aug. 14, 2014).

The ALJ also noted specific inconsistencies in Alestock's statements. R. 810. Alestock reported that he could lift five pounds repetitively and 10 pounds occasionally, but exhibited mostly normal strength in his extremities upon testing. R. 1236, 1238. At the May 2011 hearing, Alestock testified that he last performed yard work for someone "a month ago or so" when he did some mowing. R. 58. Shortly thereafter he stated that he used a weed-whacker "last week probably." R. 59. He also claimed to be unable to shovel snow, R. 59, but when he went to the emergency department in January 2013, he reported shoveling snow the week before. R. 1252. At the initial hearing, he testified that fatigue and other medical issues precluded him from holding a full time job after the restaurant he was working in closed in 1998, R. 37; at the November 2013 hearing, he stated that he started doing odd jobs in 1998 "because mostly—then I couldn't find—I was an alcoholic then. So my work ethic wasn't all that great," R. 837. The ALJ properly considered these discrepancies when evaluating Alestock's credibility. *See Bishop*, 583 F. App'x at 67 (finding no error where "the ALJ cited specific contradictory testimony and evidence in analyzing Bishop's credibility and averred that the entire record had been reviewed"); *Sowers v. Colvin*, No. 4:12cv29, 2013 WL 3879682, at *4 (W.D. Va. July 26, 2013) (finding that the claimant's inconsistent statements about his symptoms provided substantial support for ALJ's adverse credibility finding).

The ALJ also found that Alestock's reported activities conflicted with his claimed limitations. In addition to doing yard work for money, Alestock's testimony and Function Reports indicate that he cooks simple meals, does basic cleaning, and shops for groceries, although he uses an electric cart for large trips. R. 62–64, 254–61, 1009–16. While these activities are not extensive, the ALJ could reasonably find that this combination of yard work and limited housekeeping was inconsistent with the complete disability Alestock claims. *See, e.g.*, *Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005).

Accordingly, I find that the ALJ gave several specific, adequate reasons for finding that Alestock's allegations of debilitating shortness of breath are not reasonably consistent with the medical and other evidence in the record and substantial evidence supports his reasons. S*ee* 20 C.F.R. § 416.929(c)(4).

D. *The VE's Testimony*

Alestock additionally challenges the ALJ's finding that he can perform his past work as a lawn mower/landscape worker, dishwasher, and flagger.[8] The VE testified that these jobs were either medium or light exertion. R. 850–52, 854–55. Alestock contends that the VE's classification of his past yard mowing work as medium exertion is incorrect under the Dictionary of Occupational Titles ("DOT"). He argues that yard mowing falls under Landscape Gardener, 408.161-010, which is heavy exertion. Pl. Br. 8–9. Alestock's argument is belied by the VE's testimony at the 2013 hearing:

> [Atty]: I looked at the DOT some months ago. The only place I could find lawn mowing with a power mower or a hand mower was under the description of

---

[8] To the extent that this argument rests on Alestock's challenge to the ALJ's credibility assessment, his argument fails. As discussed above, the ALJ's credibility analysis is adequate and supported by substantial evidence. Alestock has not otherwise challenged the ALJ's RFC determination that he can perform medium work with some postural limitations.

16

> landscape gardener, which I understood to be a heavy exertional level. Am I mistaken in my reading?
>
> [VE]: No, there is one there. There's also one under, I think it's landscaper or groundskeeper. And that's 406.687-010. There's also one that would cover that under 406.687-014. So there are different ones in there, it just, you know, it depends on the interpretation. One of these involves, like planting trees and that sort of thing. Some don't, so it really just depends. They're not exact fits. They all sort of cross over.

R. 854. The VE's testimony is both reasonable and accurate: DOT 406.687-010, Greenskeeper II, and DOT 406.687-014, Groundskeeper, both list mowing with a hand or power mower as a duty and are classified as medium exertional. U.S. Dep't of Labor, *Dictionary of Occupational Titles* 406.687-010, -014 ("*DOT*"). Based upon Alestock's testimony about the type of work he was performing—mowing, raking, and weed-whacking—the ALJ properly found that these jobs are a better fit than Alestock's counsel's proposal of Landscape Gardener, which can include planting trees, digging trenches, or repairing asphalt walkways. *See DOT* 408.161-010. There was no error is the VE's testimony or the ALJ's reliance upon it.

Accordingly, I find that the ALJ's determination that Alestock can perform his past work is supported by substantial evidence.

## V. Conclusion

This Court must affirm the Commissioner's final decision that Alestock is not disabled if that decision is consistent with the law and supported by substantial evidence in the record. *Meyer*, 662 F.3d at 704. The Commissioner has met both requirements. Accordingly, the Court will **GRANT** the Commissioner's motion for summary judgment, ECF No. 16, and **DISMISS** this case from the docket. A separate order will enter.

ENTER: September 28, 2015

*[signature]*

Joel C. Hoppe  
United States Magistrate Judge